IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                Plaintiff,

Vs.                                                      No. 07-40154-01-SAC

NOEL GUTIERREZ-CASADA a/k/a
Noel Gutierrez-Casado,

                Defendant.

## MEMORANDUM AND ORDER

The one-count  indictment charges that defendant was found in Shawnee County, Kansas, is an alien who had previously been convicted of an aggravated felony of possession of narcotic drugs for sale, was deported from the United States on June 21, 2007, and knowingly and unlawfully reentered the United States on or about July 1, 2007 without the consent of the Attorney General of the United States, in violation of 8 U.S.C. §1326(a).

This case comes before the court on defendant's motion to suppress statements and evidence. (Dk. 12). Defendant contends that law

enforcement officers illegally entered into and searched his residence in violation of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *Payton* established, and the Tenth Circuit has recently reaffirmed,[1] that warrantless entries into a person's home are unreasonable even where based upon probable cause, unless exigent circumstances are also shown.  Defendant contends that the circumstances leading to his discovery in the United States and flowing from it, including his identification and his fingerprints, should be suppressed as fruits of the poisonous tree.

Among other arguments, the government counters that the defendant, as an illegal alien[2] who is a previously deported aggravated felon, lacks standing to raise a Fourth Amendment challenge. (Dk. 14). As the Supreme Court explained in *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998),"the definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."[ *Rakas v. Illinois*,] 439 U.S. at 140, 99 S.Ct.

---

[1]*See United States v. Reeves*, __ F.3d __, No. 07-8028 (10th Cir. May 7, 2008).

[2]The court uses this term because it is legally precise and is preferred by experts. *See* Bryan A. Garner, A Dictionary of Modern Legal Usage 898-99 (2d ed.1995).

421. Accordingly, the court will first examine this issue, by examining substantive law.

**General Fourth Amendment**

As the Tenth Circuit has recently articulated, the Fourth Amendment prohibits only searches and seizures which are unreasonable. *Reeves v. Churchich*, 484 F.3d 1244, 1260 (10th Cir.2007). Using traditional standards of reasonableness, the court assesses "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which [the search] is needed for the promotion of legitimate governmental interests." *Virginia v. Moore*, slip op  __ U.S. __, 2008 WL 1805745 (No. 06-1082, April 23, 2008) (citations omitted) (holding that regardless of state law, warrantless arrest based on probable cause for any crime committed in the presence of an arresting officer is constitutionally reasonable.)

The "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter,* 525 U.S. at 88 (citing *Rakas,* 439 U.S. at 143). The defendant bears the burden of establishing a Fourth Amendment violation.

3

*United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir.2006); *United States v. Patterson*, 472 F.3d 767, 775 (10th Cir.2006). To avail himself of the protection accorded by the Fourth Amendment, the defendant must prove that his subjective expectation of privacy in the area searched was also objectively reasonable. *Rakas*, 439 U.S. at 130-31, n. 1. "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Id.*

The government argues that defendant lacks standing to challenge the arrest and search because he is a "previously convicted aggravated felon who was previously deported and who has entered the United States again without permission." Dk. 14, p. 3. Despite having filed multiple briefs regarding this matter, defendant's sole challenge to the factual predicates of the prosecutor's argument is a conclusory statement that "there is no evidence in the record" of his illegal status. Dk. 16, p. 8. Defendant is correct.

Nonetheless, defendant's conviction of the aggravated felony of possession of narcotic drugs for sale, (No. 05-CR-20, Shawnee County Kansas, on or about  April 1, 2005), and defendant's order of deportation

4

(from the United States to the Republic of Mexico on June 21, 2007), are subject to judicial notice. Neither fact is subject to reasonable dispute, and both facts are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201; *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir.1979) (noting that "federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"). *See also Pompa v. American Family Mut. Ins. Co.*, 520 F.3d 1139, 1149 (10th Cir. 2008) (holding court could have taken judicial notice of litigant's state court conviction); *City of Wichita, Kan. v. United States Gypsum Co.*, 72 F.3d 1491, 1496 (10th Cir.1996) (finding administrative regulations subject to judicial notice); *Opoka v. Immigration & Naturalization Service*, 94 F.3d 392, 395 (7th Cir.1996) (taking judicial notice of immigration service's decision); *Tran v. Com. of Northern Mariana Islands,* 780 F.Supp. 709 (D.N.Mariana Islands,1991) (taking judicial notice of court filings in deportation proceedings involving the same litigant.) Because defendant has failed to offer any facts contrary to those above which the court judicially notices, defendant's status is for purposes of this

motion as the government asserts.

A reasonable expectation of privacy is determined by examining the totality of the facts and circumstances of each case. *Rakas*, 439 U.S. at 152 (Powell, J. concurring). "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of ... [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628 (1980) (citation omitted). The principal object of the Fourth Amendment is the protection of privacy rather than property, and the Supreme Court has "increasingly discarded fictional and procedural barriers rested on property concepts." *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 304, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). "The Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1968). Other relevant factors include whether the defendant was legitimately on or in possession of the premises, the history of the Fourth Amendment, and society's recognition of permissible conduct in particular places. *Rakas*, 439 U.S. at 152-53, 99 S.Ct. at 435; *United States v. Abreu*, 730 F.Supp. 1018, 1026 (D.Colo.1990)*.*

6

Generally, an individual has a reasonable expectation of privacy in the interior of one's own home. *Kyllo v. United States*, 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). But a Fourth Amendment search does not occur-even when the explicitly protected location of a *house* is concerned-unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable." (Citation omitted)." *Kyllo*, 533 U.S. at 33.

As the Supreme Court has noted, a person may lack a reasonable expectation of privacy in a place in which his presence is "wrongful."

> Obviously, however, a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence, in the words of *Jones*, 362 U.S., at 267, 80 S.Ct., at 734, is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.' " *Katz v. United States*, 389 U.S., at 361, 88 S.Ct., at 516 (Harlan, J., concurring).

*Rakas*, 439 U.S. at 143, n. 12 (holding passengers in car had no reasonable expectation of privacy in car's glove compartment or area under seat of vehicle where seized items were found).

**Precedent**

"The question whether a warrantless search of a home is reasonable and hence constitutional must be answered no in most instances," *Kyllo*, 533 U.S. at 33, but the antecedent question whether this defendant can invoke the protections of the Fourth Amendment is less clear. Neither the Supreme Court nor the Tenth Circuit, nor any other Circuit has decided whether a previously deported aggravated felonious illegal alien is protected by the Fourth Amendment. Most cases in this circuit which have touched upon similar issues have avoided deciding them. See e.g., *United States v. Esparza-Mendoza*, 386 F.3d 953, 955 (10th Cir. 2004) (affirming on merits instead of reaching the illegal alien standing issue addressed at length by district court); *United States v. Iribe*,11 F.3d 1553 (10th Cir.1993) (not discussing the standing issue addressed by the district court in 806 F.Supp. 917, 919 (D.Colo.1992); *United Stateas v. Cota-Herrera,* 75 Fed.Appx. 695 (10th Cir.2003) (not mentioning standing); *United States v. Medina-Ortega,* 2000 WL 1469314, 1 -2 (D. Kan. 2000) (assuming, without deciding, that an illegal alien defendant has standing to challenge a search under the Fourth Amendment.) Assumptions of standing "are not binding in future cases that directly raise the questions." *Verdugo-Urquidez*, 494 U.S. at 272, 110 S.Ct. at 1065. Accordingly, no precedent exists in this Circuit.

The remarkable exception to the avoidance trend is *United States v. Esparza-Mendoza*, 265 F. Supp. 2d 1254 (N.D. Utah 2003). There, United States District Court Judge Paul Cassell, after a lengthy analysis of case law, as well as the text and structure of the Fourth Amendment, held that previously deported illegal alien felons are not protected by the Fourth Amendment's prohibition against unreasonable searches. *Id.* at 1273. That decision was based upon the "unique status of felons" who are generally excluded from the political process and the national community in a permanent way, and thus lack sufficient connection with the United States to be considered part of its community. *See United States v. Atienzo*, 2005 WL 3334758, 4 (D.Utah 2005) (J. Cassell so stating).[3]

The "sufficient connection" analysis has its genesis in a Supreme Court case which found the Fourth Amendment inapplicable to the search by American authorities of a Mexican residence of a Mexican resident who had no voluntary attachment to the United States. In *Verdugo-Urquidez*, 494 U.S. 259, 110 S.Ct. 1056,108 L.Ed.2d 222 (1990), the Supreme Court

---

[3]In *Atienzo*, J. Cassell held that illegal aliens who have *not* been previously deported may have Fourth Amendment rights when they have developed sufficient connections with the United States to be considered part of its community.

examined the language of the Fourth Amendment [4] and found that its term,

"the people," is a term of art protecting a class of persons who are part of a

national community or who have otherwise developed sufficient connection

with this country to be considered part of that community.

> [The Fourth Amendment] text, by contrast with the Fifth and Sixth
> Amendments, extends its reach only to "the people." Contrary to the
> suggestion of amici curiae that the Framers used this phrase "simply
> to avoid [an] awkward rhetorical redundancy," ... "the people" seems
> to have been a term of art employed in select parts of the
> Constitution...While this textual exegesis is by no means conclusive,
> it suggests that "the people" protected by the Fourth Amendment,
> and by the First and Second Amendments, and to whom rights and
> powers are reserved in the Ninth and Tenth Amendments, refers to a
> class of persons who are part of a national community or who have
> otherwise developed sufficient connection with this country to be
> considered part of that community. *See United States ex rel. Turner
> v. Williams*, 194 U.S. 279, 292, 24 S.Ct. 719, 723, 48 L.Ed. 979
> (1904) (Excludable alien is not entitled to First Amendment rights,
> because "[h]e does not become one of the people to whom these
> things are secured by our Constitution by an attempt to enter
> forbidden by law"). The language of these Amendments contrasts
> with the words "person" and " accused" used in the Fifth and Sixth
> Amendments regulating procedure in criminal cases.

*Verdugo-Urquidez*, 494 U.S. at 265-66.

The Supreme Court in *Verdugo-Urquidez* distinguished cases which

had held that resident aliens enjoy constitutional rights under the Fifth,

---

[4]"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..." U.S. Constitution, Amend. IV.

Sixth, and Fourteenth Amendments, stating:

> These cases, however, establish only that aliens receive
> constitutional protections when they have come within the territory of
> the United States and developed substantial connections with this
> country. *See, e.g., Plyler, supra*, 457 U.S., at 212, 102 S.Ct., at 2392
> (The provisions of the Fourteenth Amendment " 'are universal in their
> application, to all persons within the territorial jurisdiction ...' ")
> (quoting *Yick Wo, supra*, 118 U.S., at 369, 6 S.Ct., at 1070); *Kwong
> Hai Chew, supra*, 344 U.S., at 596, n. 5, 73 S.Ct., at 477, n. 5 ("The
> Bill of Rights is a futile authority for the alien seeking admission for
> the first time to these shores. But once an alien lawfully enters and
> resides in this country he becomes invested with the rights
> guaranteed by the Constitution to all people within our borders")
> (quoting *Bridges, supra*, 326 U.S., at 161, 65 S.Ct., at 1455
> (concurring opinion) (emphasis added)). Respondent is an alien who
> has had no previous significant voluntary connection with the United
> States, so these cases avail him not.

*Verdugo-Urquidez*, 494 U.S. 259, 270-271(1990) (citing cases).

The rationale for the "sufficient connection" analysis is based in the

social contract theory.

> Because our constitutional theory is premised in large measure on
> the conception that our Constitution is a "social contract,"
> V*erdugo-Urquidez*, 856 F.2d at 1231-33, "the scope of an alien's
> rights depends intimately on the extent to which he has chosen to
> shoulder the burdens that citizens must bear." *Id.* at 1236; *see also
> Verdugo*, 494 U.S. at 272-73, 110 S.Ct. at 1065 (explaining that the
> Supreme Court has yet to decide whether the Fourth Amendment
> applies at all to illegal aliens in the United States). "Not until an alien
> has assumed the complete range of obligations that we impose on
> the citizenry may he be considered one of 'the people of the United
> States' entitled to the full panoply of rights guaranteed by our
> Constitution." *Id.*

11

*United States v. Barona*, 56 F.3d 1087, 1093 -1094 (9th Cir. 1995).

V*erdugo-Urquidez* also notes that "constitutional decisions of this Court expressly accord[ ] differing protection to aliens than to citizens, based on our conclusion that the particular provisions in question were not intended to extend to aliens in the same degree as to citizens." *Verdugo-Urquidez,* 494 U.S. at 273, 110 S.Ct. at 1065. *See Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (holding "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.... however, once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.")

This court does not find *Verdugo-Urquidez* controlling[5] because it is factually distinguishable, but finds its rationale to be persuasive. Cases

---

[5]Some have questioned whether *Verdugo-Urquidez*'s definition of "the people" is binding as a majority decision of the Supreme Court, or is merely persuasive authority as a plurality decision. *Compare Esparza-Mendoza*, 265 F.Supp.2d at 1261(stating "this court is not at liberty to second-guess Justice Kennedy's direct statement that he was joining the Court's opinion") with *United States v. Guitterez*, 983 F.Supp. 905, 912 -913 (N.D.Cal.1998) (interpreting *Verdugo-Urquidez* as a plurality; finding an illegal alien need not demonstrate a "connection" with this country as a prerequisite to asserting the shelter of the Fourth Amendment), *reversed on other grounds,* 203 F.3d 833 (9th Cir.1999).

decided after *Verdugo-Urquidez* have applied its "sufficient connection" approach even to searches occurring within the United States. *See e.g.*, *United States v. Ullah*, 2005 WL 629487, 29 (W.D.N.Y. 2005) (border search case reading *Verdugo-Urquidez* to hold "that unless an alien can establish that prior to a search the alien has "established a significant voluntary connection with the United States" the Fourth Amendment does not apply to the search")*; Martinez- Aguero v. Gonzalez,* 2005 WL 388589, at *16-17 (W.D.Tex. 2005)*; American Immigration Lawyers Ass'n v. Reno*, 18 F.Supp.2d 38, 60 & n. 17 (D.D.C. 1998) (concluding that regular visits to United States would not constitute substantial connection).

One federal court has read *Verdugo-Urquidez* to establish a bright-line rule that illegal aliens can never establish the substantial connections necessary to warrant entitlement to the protection of the Fourth Amendment.

> The record in the instant case, however, is devoid of any evidence demonstrating that Ullah, an alien, had lawfully entered and resided in this country for a sufficient period to trigger the application of Fourth or Fifth Amendment protections to the challenged border inspections to which he was subjected. Significantly, the Supreme Court has specified that it is only upon "lawfully" entering the United States that an alien may begin to establish the substantial connections necessary to warrant entitlement to Fourth Amendment protection upon later seeking entry into the United States. *Kwong Hai Chew, supra*, at 596 n. 5. Accordingly, as the record is devoid of any

indication that Ullah was ever legally present in the United States,
Ullah cannot satisfy the requirement for substantial connections
under *Verdugo-Urquidez, supra*.

*Ullah*, 20005 WL 629487, 29 -30  (W.D.N.Y 2005). The court examines the

present issue in light of the background and rationale expressed in

*Verdugo-Urquidez*.

The court first examines the impact of defendant's prior deportation.

Defendant's previous voluntary connection with the United States resulted

in an involuntary final order of deportation based upon his acts (aggravated

felony) coupled with his status (illegal alien). *See* 8 U.S.C.1227(a)(2)(A)(iii).

Defendant has already been entitled to a deportation hearing, the legal

effect of which was to determine that defendant was ineligible to be in this

country at the time of the search.  A deportation order effects a significant

change in one's legal status.

"Control over matters of immigration is a sovereign prerogative."

*Landon,* 459 U.S. at 34-35. The Supreme Court has repeatedly sustained

deportation as an exercise of the sovereign's power to determine the

conditions upon which an alien may reside in this country. *See Mahler v.*

*Eby*, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924); *Bugajewitz v. Adams*,

228 U.S. 585, 33 S.Ct. 607, 57 L.Ed. 978 (1913); *Fong Yue Ting v. United*

*States*, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). It is an "accepted principle of international law, that every sovereign nation has the power, as inherent in sovereignty and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *United States ex rel. Turner v. Williams*,194 U.S. 279, 290, 24 S.Ct. 719, 721 (U.S.1904). Statutes authorizing deportation of an aliens are viewed as an implementation of the sovereign power to exclude, from which the deporting power is derived. *Trop v. Dulles*, 356 U.S. 86, 98, 78 S.Ct. 590, 596 - 597 (1958). As long as "aliens fail to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders." *Carlson v. Landon*, 342 U.S. 524, 534, 72 S.Ct. 525, 531 (1952).

The United States exercised its sovereign right in determining that this defendant is not permitted to remain within its borders. A more insubstantial connection to this country at the time of the search can hardly be imagined. Because the record in the present case lacks any evidence that this previously deported felonious defendant was legally present in the

15

United States at the time of the search, he cannot establish a connection substantial enough to invoke the protection of the Fourth Amendment.

The court also notes that defendant was deported for having been convicted of an aggravated felony. The Tenth Circuit has recently reaffirmed that persons subject to criminal sanctions have more limited Fourth Amendment rights than do law abiding citizens.

> Moreover, persons subject to criminal sanctions, such as incarcerated prisoners and parolees, have more limited Fourth Amendment rights. For instance, the Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). While "parolees are protected against unreasonable searches and seizures[,] ... their rights ... are not coextensive with those of ordinary citizens." *Sherman v. U.S. Parole Comm'n*, 502 F.3d 869, 873 (9th Cir.2007). Most courts that have considered the Fourth Amendment implications of seizing a parole violator have held that a parolee remains in legal custody during the period of his parole and therefore that the retaking of a parole violator does not constitute an arrest for Fourth Amendment purposes. *See United States v. Polito*, 583 F.2d 48, 54-56 (2d Cir.1978) (collecting cases); see also *Baumhoff v. United States*, 200 F.2d 769, 770 (10th Cir.1952) ("It is true that during the time a prisoner is at large on parole he remains in constructive custody.").... Nor is an escaped convict entitled to the same Fourth Amendment protections as an ordinary citizen. "The Fourth Amendment is not triggered anew by attempts at recapture because the convict has already been 'seized,' tried, convicted, and incarcerated." *Gravely v. Madden*, 142 F.3d 345, 348 (6th Cir.1998). Thus, escaped convicts may generally be taken back into custody without a warrant or a hearing. *Tavarez v. U.S. Attorney Gen.*, 668 F.2d 805, 808 (5th Cir.1982).

*Jenkins v. Currier*, 514 F.3d 1030, 1033 -1034 (10th Cir.2008). See generally *Samson v. California*, 547 U.S. 843, 844, 126 S.Ct. 2193, 2195 (2006) (warrantless search of parolees' residence is permissible because they have "severely diminished privacy expectations by virtue of their status alone."); *United States v. Knights*, 534 U.S. 112, 121-22, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (warrantless search of a probationer's home is permissible without probable cause). Although deportation proceedings are not criminal in nature, defendant, by virtue of having been convicted of an aggravated felony rendering him subject to deportation, *see* 8 U.S.C. §1227, has a diminished privacy expectation by virtue of his criminal status alone.

The Tenth Circuit has recently commented on the relationship between illegal aliens and crime, stating that "illegal aliens" are among persons "typically considered dangerous or irresponsible" because:

> they have "already violated a law of this country" and are "likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood." *Id.* at 368 (quoting *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984)).

*Untied States v. Juan Ochoa-Colchado*, 521 F.3d 1292 (10th Cir. April 11, 2008) (finding alien who had applied for adjustment of status was still

"illegally or unlawfully in the United States" for purposes of § 922(g)(5)(A).)
As a previously deported aggravated felonious alien currently indicted for
illegally reentering this country, the defendant is among the "underground
population of persons who, unable to secure lawful employment, have a
greater likelihood to engage in criminal conduct." *Id., quoting United States
v. Orellana*, 405 F.3d 360, 366 (5th Cir. 2005).

The court also notes that defendant has apparently reentered the
country in violation of his final order of deportation. Unsanctioned entry in
the United States is a crime. 8 U.S.C. § 1325. Defendant's presence
anywhere in the United States is wrongful, just as an escaped felon's
presence anywhere outside his prison is wrongful. The court views
defendant's Fourth Amendment position at the time of the search as akin to
that of a constructive escapee.

"[T]he legitimacy of certain privacy expectations vis-a-vis the State
may depend upon the individual's legal relationship with the State."
*Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 654, 115 S.Ct. 2386,
2391 (1995).

> Although, as a general rule, police officers may not, in the absence of
> consent or exigent circumstances, effect a warrantless arrest of a
> suspect while the suspect is within the confines of his own home *(see
> Payton v. New York, supra*), this general rule does not apply with the

18

> same force to probationers or parolees, much less to escaped
> convicts. Under the Federal Constitution, it is clear that a parolee or a
> probationer may be arrested in his home without a judicial warrant
> (Citations omitted). This rule applies with even more force in the case
> of an escaped convict, and, in our view, it applies under the New
> York Constitution as well as under the Federal Constitution.

*People v. Hernandez*, 218 A.D.2d 167, 639 N.Y.S.2d 423 (1996).

In *United States v. Roy*, 734 F.2d 108 (2d Cir.1984), the Second

Circuit held that an escaped felon, as no more than a "trespasser on

society," could not have a legitimate expectation of privacy in the

passenger compartment or trunk of his automobile.

> Roy's presence in Rocky Hill on December 3 was also wrongful,
> since he was an escapee from the MCC in Chicago. *See* 18 U.S.C. §
> 751 (1982) (inmate who escapes from federal custody commits a
> criminal act). At the time of the search and seizure, Roy was no more
> than a trespasser on society. *Cf. State v. Hiott*, 276 S.C. 72, 77, 276
> S.E.2d 163 (1981) ("As prison escapees, defendants obviously were
> not legitimately on the premises.").  His position is not unlike that of
> the Supreme Court's hypothetical burglar or occupant of a stolen car.

*Roy*, 734 F.2d at 111 (upholding warrantless search of car). *See* also

*United States v. Arango,* 912 F.2d 441 (10th Cir.1990), *cert. denied*, 499

U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991); *United States v.*

*Malady,* 209 Fed.Appx. 848, 851, 2006 WL 3775870, 2 (10th Cir.2006) and

cases cited therein (holding that persons do not have a reasonable

expectation of privacy in a car which they do not lawfully possess).

Other cases have extended that rationale to find that escaped prisoners in hotels or residences lack a legitimate expectation of privacy. *See e,g.,United States v. Lucas*, 499 F.3d 769, 778 (8th Cir. 2007) (finding escapee had only a minimal expectation of privacy thus search without judicial warrant was reasonable); *People v. Hernandez*,  218 A.D.2d 167, 169-170, 639 N.Y.S.2d 423, 424 - 425 (N.Y.A.D. 2 Dept.1996) (finding defendant, as an escaped prisoner, was no more than a trespasser on society who was obviously not legitimately on the premises and thus had no protections under *Payton v. New York* ).

The rationale for such holdings is based upon the facts that escapees are not legitimately on any premises but prison grounds, and while on prison grounds they have no Fourth Amendment rights.

> Once the defendants had escaped unlawfully from prison, they abandoned their only legitimate premises and surrendered any future legitimate expectation of privacy. "It follows that appellant's Fourth Amendment rights were no greater as an escapee than they were while he was within the confines of the penitentiary. He had lost his constitutional protection against the invasion of his privacy and had no standing to object to a search of his (motel) room and his effects by the officers."

*State v. Hiott*, 276 S.C. 72, 77-78, 276 S.E.2d 163, 166 (S.C.1981) quoting *Robinson v. State*, 312 So.2d 15 (Miss.1975). *See also United States v. Wieling*, 153 F.3d 860, 861 -862 (8th Cir.1998) (questioning, but not

deciding whether defendant, "as an escaped felon, had a legitimate expectation of privacy in the farmhouse that was violated by the search which occurred.") Accordingly, prison escapees have no protections under *Payton. Hiott, supra.*

As a matter of policy, society is not prepared to recognize an escaped prisoner's expectation of privacy as reasonable. *State v. Amos,* 153 Wis.2d 257, 269, 450 N.W.2d 503, 507 (1989) applied the Second Circuit Court of Appeals' view expressed in *Roy* to an escapee hiding in a residence, finding that an escapee has no legitimate expectation of privacy in a residence where he or she is hiding from lawful authority.

> As a matter of policy, society is not prepared to recognize an expectation of privacy as reasonable under these circumstances. Thus, the seizure of Amos's person in Nelson's home was not unconstitutional, because Amos had no privacy interest in Nelson's home since he was an escapee from a penal institution.

*State v. Amos*, 153 Wis.2d at 269-70.  *See also State v. Lagerstrom*, 223 Wis.2d 799, 589 N.W.2d 454, 1998 WL 890412, 2 (Wis.App.1998) (holding escapee has no Fourth Amendment privacy right in motel room he is hiding in); *Casey D.D. v. State*, 174 Wis.2d 601, 501 N.W.2d 470, 1993 WL 38334, 1(Wis.App.1993) (because escapee can only lawfully be present in the penal facility to which defendant is assigned, escapee cannot claim

legitimate privacy interest in place of temporary hiding, thus a "runaway" from a group home placement was not lawfully in a house despite his status as an invited guest.)

Just as an escaped prisoner is wrongfully present anywhere but in the penitentiary, the deported felonious alien is wrongfully present anywhere in the United States. Just as an escaped prisoner enjoys no greater Fourth Amendment rights when outside the prison walls than he does when within them, a deported felonious alien obtains no greater Fourth Amendment rights by reentering the United States than he would have had if he had remained outside the United States. Had this defendant remained outside the United States, he would have had no Fourth Amendment rights because that Amendment has no extraterritorial application. *See Ross v. McIntyre*, 140 U.S. 453, 464 (1891) (finding "the constitution can have no operation in another country.")*;* *Verdugo-Urquidez*, 494 U.S. at 274-75, 110 S.Ct. 1056 (holding the Fourth Amendment does not protect nonresident aliens against unreasonable searches or seizures conducted outside the sovereign territory of the United States); *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (finding it "well established that certain constitutional

22

protections available to persons inside the United States are unavailable to aliens outside of our geographic borders.") *See generally*, *Atamirzayeva v. U.S.*, --- F.3d ----, 2008 WL 1959519 (Fed. Cir.2008) (reviewing cases finding that the Constitution is subject to territorial limitations).

Defendant's Fourth Amendment position at the time of the search is also comparable to that of a trespasser who has entered on another's land without the landowner's consent. "Trespassers have not been granted Fourth Amendment rights because they do not have a reasonable expectation of privacy in the property." *State v. Cruz*, 15 Kan.App.2d 476, 481, 809 P.2d 1233, 1237 (Kan.App.1991).

*Rakas* recognized as much by noting "'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search." *Rakas*, 439 U.S. at 141, fn. 9, 99 S.Ct. 421 (stating that a burglar in another's house does not have a legitimate expectation of privacy there because his "presence … is 'wrongful' ") (quoting *Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). The Court in *Jones* was quite careful to note that "wrongful" presence at the scene of a search would preclude a defendant from objecting to the legality of the search, stating:

23

> No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched.

*Jones*, 362 U.S. at 267.See *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000) (noting "the burglar's expectation of privacy loses its legitimacy not because of the wrongfulness of his activity, but because of the wrongfulness of his presence in the place where he purports to have an expectation of privacy.")

Because a person can have no reasonable expectation of privacy in premises on which they are wrongfully present, the Tenth Circuit has consistently held that one's status as a trespasser or squatter excludes that person from the protection of the Fourth Amendment. In *United States v. Dodds*, 946 F.2d 726, 728-729 (10th Cir.1991), the Tenth Circuit held that a squatter had no "standing" to challenge the search of an abandoned apartment where he sometimes slept because "hardly more than a fugitive presence would not be one that could be accepted by society." *Id.* at 729.

The Tenth Circuit applied the trespass rule to a person who had lived in the premises for over eight months, in *United States v. Ruckman*, 806

F.2d 1471, 1472 (10th Cir.1986). There, the defendant had attempted to "enclose" a natural cave on federal land by fashioning a crude entrance wall from boards and other materials which surrounded a so-called "door." *Id*, at 1472. The Tenth Circuit concluded that the Fourth Amendment rights of the trespasser were not violated by a search without a warrant and without exigent circumstances because the defendant lacked a reasonable expectation of privacy. *Id.* at 1472-74. In reaching its holding, the Tenth Circuit noted that "the test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity but whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Id.* at 1474. The Tenth Circuit relied on the First Circuit's opinion in *Amezquita*, which found a claim that squatters had a reasonable expectation of privacy to be "ludicrous." *Ruckman* 806 F.2d at 1473 -1474. *Ruckman* establishes that "failing presumably even on technical grounds, to have a "legal right" to occupy land prevents any reasonable expectation of privacy in a dwelling on such land from arising, even if one owns the structure searched on the illegally occupied land." *Id.*, at 1474, McKay, dissenting.

The trespass rule is applied even more stringently where the occupant

has received notice to depart. Thus in *Amezquita v. Hernandez-Colon*, 518

F.2d 8, 11-12 (1st Cir.1975), *cert. denied*, 424 U.S. 916, 96 S.Ct. 1117, 47

L.Ed.2d 321 (1976), the court held that squatters who had been asked to

leave farmland owned by Commonwealth of Puerto Rico lacked a Fourth

Amendment reasonable expectation of privacy to support an injunction

protecting their homes, stating:

> Nothing in the record suggests that the squatters' entry upon the land
> was sanctioned in any way by the Commonwealth. The plaintiffs
> knew they had no colorable claim to occupy the land; in fact, they had
> been asked twice by Commonwealth officials to depart voluntarily.
> That fact alone makes ludicrous any claim that they had a reasonable
> expectation of privacy.

*Amezquita*, 518 F.2d at 11. *See also Thomas v. State*, 274 Ga. 156, 549

S.E.2d 359, 366 (2001) (finding defendants who sublet a townhouse had

no expectation of privacy after landlord gave them notice that they were

trespassing).

Similarly, the Tenth Circuit held in *United States v. Carr*, 939 F.2d

1442, 1446 (10th Cir.1991), that a defendant's three-week occupancy of a

hotel room that was not registered to him or to someone he was sharing it

with, could not be the basis of a legitimate expectation of privacy in the

room. When one's right to lawfully occupy the premises expires, one loses

his reasonable expectation of privacy. *See also United States v. Croft,* 429

F.2d 884, 887 (10th Cir. 1970) (holding that a guest in a hotel or motel room loses his reasonable expectation of privacy when his rental period has elapsed.) Instead, society expects one to vacate the premises in accordance with law and refuses to recognize a privacy interest after one has been lawfully noticed to leave. Here, society expects defendant to leave the United States in accordance with his final order of deportation and refuses to recognize a privacy interest in the United States after he reenters in violation of law.

Other circuits reflect the same consistent application of the rule that persons "wrongfully present" lack standing, or a reasonable expectation of privacy in the premises. *See e.g., Warner v. McCunney,* 2008 WL 73680, 2 (3rd Cir.2008) (finding no standing to challenge the search of a room where the property was under the control of the executors of an estate and plaintiff was not one of them); *United States v. Hunyady*, 409 F.3d 297, 301-02 (6th Cir. 2005) (finding no reasonable expectation of privacy in defendant's late father's house where defendant did not lawfully reside there and the house was under the control of a personal representative)*; United States v. Cunag*, 386 F.3d 888 (9th Cir. 2004) (finding a patron who procured a hotel room through fraud did not have a reasonable expectation

of privacy in the room; *United States v. McRae*, 156 F.3d 708, 711 (6th Cir.1998) (holding that defendant lacked a legitimate expectation of privacy by virtue of having stayed a week in vacant premises that he did not own or rent)*; United States v. Gale*, 136 F.3d 192, 195-96 (D.C.Cir.1998) (holding defendant who changed the locks on an apartment rented to another and used it for packaging drugs did not have a legitimate expectation of privacy in the apartment because he did not have legal authority to be there)*; Zimmerman v. Bishop,* 25 F.3d 784, 788 (9th Cir.1994) (concluding that guest of squatter had no reasonable expectation of privacy despite improvements to the property, because squatter had no legal right to occupy the land); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir.1980) (stating "mere trespasser has no Fourth Amendment protection in premises occupied wrongfully"; finding defendant lacked standing because he demonstrated neither ownership of a car, nor license from the owner to possess it).

Trespassers' attempts to assert Fourth Amendment rights are particularly unavailing when they have been individually, validly and legally ordered not to be in the place searched. "It is simply nonsense to say that society is prepared to recognize his right to be where society by the

processes of the law has ordered him not to be." *Com. v. Morrison*  429 Mass. 511, 514, 710 N.E.2d 584, 586 (Mass.1999). There, the court found that an overnight guest lacked standing to object to a search of a residence because he was "the subject of a protective order forbidding his presence in the very premises." The court noted that "[w]hat deprives this defendant of a reasonable expectation of privacy is not his status as a law violator in general, but the fact that he was under a specific and valid legal order not to be in this particular place." *Commonwealth v. Morrison*, 429 Mass. at 514.

"It would be irrational to say that society recognizes as reasonable an individual's subjective expectation of being free from police intrusion upon his privacy in a place after he has been legitimately excluded from that place. *Rambo*, at 1296." *State v. Oien*, 717 N.W.2d 593, 597 (N.D.2006). In *Oien*, the defendant had been sent a notice of a "no trespass" order forbidding him from being on Housing Authority property. Despite the fact the defendant may have been an invited overnight guest, the court concluded he was not entitled to the protection of the Fourth Amendment because he could have no reasonable expectation of privacy in the apartment after he became aware the landlord had legitimately forbidden

him from being on that property.

Similarly, in *United States v. Brown*, 484 F.Supp.2d 985, 992 -993

(D.Minn. 2007), an invited overnight guest was nonetheless found to be

wrongfully present at a residence. Because the landlord had banned that

defendant from those premises for one year, the defendant lacked a

reasonable expectation of privacy and was unable to object to the legality

of the search of the residence. 484 F.Supp.2d at 994.

In *United States v. Rambo*, 789 F.2d 1289, 1295-6 (8th Cir.1986), the

Eighth Circuit held there is no reasonable expectation of privacy in a place

from which an individual has been justifiably expelled, stating:

> In the present case, however, Rambo was asked to leave the hotel
> by the officers, acting at the request of and on behalf of the hotel
> manager, because of his disorderly behavior. Magistrate's Report at
> 1-2. Thus, Rambo was justifiably ejected from the hotel under
> Minnesota law, see § 327.73 subd. 1, and the rental period therefore
> had terminated. *See United States v. Haddad*, 558 F.2d 968, 975 (9th
> Cir.1977). At that time, control over the hotel room reverted to the
> management. Rambo no longer had a reasonable expectation of
> privacy in the hotel room, and therefore is now without standing to
> contest the officers' entry (search) into the hotel room. (Citations
> omitted.) *Rambo cannot assert an expectation of being free from
> police intrusion upon his solitude and privacy in a place from which
> he has been justifiably expelled.*

*Rambo*, 789 F.2d at 1295 -1296 (italics added).

Here, defendant has been "justifiably expelled" from the United

States by virtue of his deportation. He is currently an alien whose presence within the United States is forbidden and specifically prohibited by law. His very presence in this country is "wrongful," *Jones*, 362 U.S., at 267, 80 S.Ct., at 734, and his expectation of freedom from governmental intrusion is not "one that society is prepared to recognize as 'reasonable.' " *Katz* , 389 U.S., at 361, 88 S.Ct., at 516 (Harlan, J., concurring).  *Rakas*, 439 U.S. at 143, n. 12, 99 S.Ct. 421, 430. Here, as in *Com. v. Morrison*, "It is simply nonsense to say that society is prepared to recognize his right to be where society by the processes of the law has ordered him not to be."        Here, of course, the court is not examining the Fourth Amendment rights of foreign citizens, or of law abiding United States citizens, or of illegal aliens in the United States who are merely suspected of a crime. Instead, the court is examining the Fourth Amendment rights of a previously deported, aggravated felonious illegal alien who chose to reenter the United States knowing that the sovereign country, by due process of law, had recently ordered him to leave and stay out of the country. Simply put, such persons are not entitled to the same Fourth Amendment protections as are ordinary citizens. Based upon the totality of the circumstances, the court finds, for the reasons set forth above, that at the time of the search, this defendant

lacked a reasonable expectation of freedom from governmental intrusion in the place in which he was found. Accordingly, his motion to suppress shall be denied. The court finds it unnecessary to reach the other issues raised by the parties.

IT IS THEREFORE ORDERED that defendant's motion to suppress statements and evidence (Dk. 12) is denied.

Dated this 14th  day of May, 2008.

s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge